May it please the Court. My name is Celia Reumann, and I, along with my co-counsel, Michael O'Connor, represent the appellant in this case, Lesley Mitchell. We would like to reserve 10 minutes for rebuttal. All right. In this case, from arrest and interrogation through imposition of sentence, the improper use of Indian status and jurisdiction resulted in racial and religious and thus constitutionally offensive discrimination, tainting both the convictions and death sentences. As this Court is aware, there are many issues that we have raised in the briefs, but because of the time constraints, with the Court's indulgence, we will begin by addressing the issues presented during jury selection and then focus on those addressing jurisdiction. And if time remains, addressing some of the other issues discussed in the brief. We have submitted additional authority to your courtroom deputy for the Court's consideration, and it may come up during oral argument. It is perhaps in the area of jury selection that the improper role of race and religion is the most obvious. From the decision to transfer this case from the division in which the offense occurred through the role of the jury commissioner in narrowing the pool for those she found qualified through strikes for cause and the use of peremptory challenges, race and religion played an improper role in this case. As this Court is aware, in Alexander v. Louisiana, the Supreme Court made clear that this Court should consider the process from beginning to end in the jury selection area to determine whether equal protection has been violated. And here, at every stage, the percentage of Native Americans in the venere were improperly diminished. They were diminished by approximately 25 percent during the initial pool by the jury commissioner, and to the time that the jurors presented themselves for voir dire in the courtroom. They were diminished again significantly through the strikes for cause process. Focusing this Court's attention on the questioning and striking of Juror No. 24. Juror No. 24 was a Native American man who presented himself for jury selection in this case. This juror, while perhaps the most egregious, was not the only Native American juror that we've raised in this case, but we'll focus on him for purposes of argument today. This juror was questioned in a way that no jurors of any other race or religion were questioned. This juror was questioned in an improper way, and as the Supreme Court made clear in Batson, the nature of the questioning can affect the analysis of whether the process was discriminatory. This juror, during voir dire, affirmed seven times, in addition to his answers in his jury questionnaire, but in court, he affirmed seven times that there was nothing about his moral, religious, or personal beliefs that would prevent him from. Sotomayor, is this Roanhorse? It is, Your Honor. Okay. This juror was asked repeatedly by the district court whether he could be fair, whether he could follow the law. And, in fact, in response to a question by the prosecution, he affirmed that not only did he have no belief that would interfere with his ability to be fair and follow the law in this case. He affirmed that the trouble is, you know, he may have done that. He also, at the same time, said it would be difficult for him to sit in judgment of another Navajo. He said that two or three times. And a whole bunch of other things, which the district judge, sitting there and being on the spot, being on the scene, determined would make it impossible for him to be a fair and partial juror. So it's not just that he may have said some things that indicated he could try, but he clearly said it would be difficult for him to sit in judgment on another Navajo. That's correct, Your Honor. But that isn't the standard for whether someone can serve on a capital case. As this Court is aware, the standard is whether their belief system would prevent or substantially impair. And this juror repeated, but if he flat-out said, I just can't sit in judgment on another Navajo, what more do you need? Well, I would point to the fact that, first of all, this juror was questioned in a way that people of other races weren't questioned. And that in itself was improper. No white person was asked whether their race would affect their ability to judge this person. I'm sorry? No person of any. Every, every prospective juror was asked whether, in effect, the fact that the defendant was a Native American would have any effect on their ability to be fair and impartial in the case. That's correct. But no jurors of any other race had their race brought into the discussion the way Native American jurors had their races brought into the questioning. This Court not only asked about, not only identified the races of the jurors in their question, but questioned how this shared racial characteristic would affect their ability to be fair and impartial. No black juror was asked whether the differences between their racial characteristics would affect their ability to be fair and impartial. So there is a difference here, Your Honor. And despite that, the answers that this juror gave unequivocally to the questions about qualifications were qualifying answers to serve on this jury. And if the Court compares the answers that that juror gave to some of the other jurors that were left on the panel, the Court will see that the questioning was different. It really is as if in this case the district court decided that all the Native Americans would have different questions asked that focused on their race. Nobody else had that kind of focus. And we believe that that kind of questioning is improper in this case, and certainly it, where the jury pool went from a potential of 434 Native American jurors down to one before the peremptory challenge process, that diminishing at every stage was improper, and I think that's where the Alexander case comes in. We would also point that it's not just Juror Roanhorse that was questioned in an improper way. Juror No. 39, who was Poppen, again, she was questioned and was qualified to sit, and it is a Whitwaterspoon violation for her to have been excused. Juror No. 39 clearly stated that she opposed the death penalty for spiritual reasons. She also said that it would be difficult. But again, difficulty is not the question. The court's, the district court's job is not to find a jury that supports the death penalty. The district court's job is to find a jury that can consider the law, follow the law, and decide based on the evidence that's presented. Juror No. 39, like Juror No. 24, repeatedly said that despite her personal beliefs, she could impose either sentence and follow the law as the court gave it. She, in fact, went beyond that and gave examples of cases where not even having sat on the jury, she would have found that the death penalty was appropriate. Despite this, this juror was stricken, and the government's explanation and the court discussed this in deciding why Juror Poppin was inappropriate to sit in this case. She made the statement that in 98 percent of murders, the death penalty would be inappropriate. The government argued that that was a basis in and of itself to strike her. But that is an accurate statement of the application of the federal, of the death penalty based on studies, that it is applied in approximately 2 percent of the cases. So that is a reasonable juror and a juror that there was no basis to strike in this case. Isn't this a judgment call on the part of Judge Merguia? I mean, she's looking the lady in the eye. She's reading the questionnaire, and then concluded, I think in her words, that 39's views were fixed. Well, I would point to that. How do we second-guess that? Well, I think that the – I think it's Brown v. Lambert is the case that would be instructive on this point, where this Court said that where the record itself is clear, relying on – and the answers given by the juror are clearly qualifying answers, deferring to some unstated demeanor, which there was no identification in the record of what exactly the Court was concerned with. So any reference to demeanor really – this Court shouldn't go there because the answers themselves are clear and the answers are qualifying. So I think that the Court's analysis – I think it's in Brown v. Lambert – discussed that that would be basically getting rid of any review if the Court just had to say, well, I find demeanor is controlling here, despite clear answers, unambiguous answers that a juror gives, that they are qualified to sit. Turning to the question of jurisdiction, it is axiomatic that the Federal Government is a government of limited and enumerated powers. While Congress has plenary power over the tribes, under long-established principles, Congress must make it clear what it intends to do when it limits and intrudes on sovereignty. As this Court is aware, this Court has repeatedly affirmed that statutes of nationwide applicability apply in Indian country. However, we would urge the Court to revisit that. In 2005, the Supreme Court – How can we do that? Well, because in 2005, the Supreme Court in United States v. Lara was analyzing the – the congressional duro fix to the tribal jurisdiction for misdemeanor offenses. And in the legislative history, this is the additional authority that we've provided to the Court. In that case, the Supreme Court cites to the congressional record in 1991 on the fix for duro, giving the tribes jurisdiction on misdemeanors. And in that, this – the Congress made absolutely clear that it – its understanding of jurisdiction in Indian country does not apply to general jurisdiction crimes. For example, the Senate report at 102-168 discusses not just the statute at issue, but discusses the Major Crimes Act and the Indian General Crimes Act. And in there, the Senate stated that the – excuse me – that the provision that they were discussing, that the statutory framework for the exercise of criminal jurisdiction in Indian country is contained in Federal law pursuant to the provisions of the Major Crimes Act. The United States has asserted exclusive jurisdiction over certain specified major crimes committed in Indian country by an Indian against another Indian. This provision excludes State jurisdiction and may exclude concurrent tribal jurisdiction. For those crimes not defined in Section 1153, Section 1152 establishes exclusive Federal jurisdiction over all other general crimes except over crimes committed in Indian country by an Indian against another Indian. So Congress is discussing what its understanding, and Congress is who decides what jurisdiction applies in Indian country. Moreover, in the House conference report, they noted the two maximums of Indian country that come into play. First of all, if I understand you correctly, you're asking this three-judge panel to overrule a string of Ninth Circuit authority based upon something in a House and Senate report? Well, yes. We are asking that, Your Honor, because the House and Senate are who decides what the plenary power is. And when Congress says, sure, and they can do it any time they wish to in a Federal statute that ends up in the U.S. Code. Well, they've clarified their position in the Congressional record on these issues, Your Honor. We would urge the Court to revisit that. Even if this Court finds that that shouldn't happen in this case with this three-judge panel, the question of whether the Federal Death Penalty Act applies in Indian country is different than just discussing a crime of general nationwide applicability. And in this case, Congress specifically has spoken on this point in the opt-in provision, limiting the application of the Federal death penalty only to those circumstances where the tribe has opted in for major crimes prosecutions. As to all other Federal death penalty crimes, it is silent. And silence is not enough when it comes to extending jurisdiction. Congress has to be expressed when it intends to do that. Moreover, the application of the Federal death penalty in Indian country is different in that it involves a unique custom or social issue of the tribe. That being, in this case, the Navajo Nation's unequivocal statement that they opposed the application of the death penalty. And as the Eighth Circuit noted in the United States v. Blue and in the Wadima case, there may be instances where the application of what would be a general criminal law should not be held to apply to Indians unless specifically provided where there is a particular Indian right and policy at issue. Here, we urge the Court to consider that there was, in fact, a specific Indian right or policy at issue, and that was the case. Do you also oppose the death penalty and do not have the death penalty? Well, I think constitutionally tribes are different. Indian jurisdiction is different than State jurisdiction. And it has different considerations because tribes are considered semisovereign. And because of the history of the sovereignty of the tribes, they are different than simply the State's opposition to the death penalty. And they are given special consideration by the Court. And specifically, when it comes to those particular Indian rights or policy, the Supreme Court in Duro discussed it. The Eighth Circuit has discussed it. And even this Court has discussed where, if there's a question, if it's ambiguous, that the Court should err on the side of leaning towards the tribe's interpretation because of the traditional history of sovereignty, because of the unique trust position. Such provision should be construed liberally in favor of the Indians because of the traditional notion of sovereignty and with the Federal policy of encouraging tribal independence. If the Court were to equate States with tribes, it would violate those principles that distinguish between the two. Unless the Court has additional questions for these and for all the reasons stated in the brief, we would ask the Court to reverse and remand. Thank you. Thank you, counsel. May it please the Court. I'm Dan Drake. I'm an assistant U.S. attorney in Phoenix. Along with Vince Kirby, another assistant U.S. attorney, we'll be arguing for the government. Mr. Kirby is going to address the issues pertaining to the trial, jury selection matters of that sort. I'm going to confine myself to the constitutional challenges in the jurisdictional aspects, the jury instructions, discovery and prosecutorial misconduct. We'd like to do that. Can you mind pulling the mic up a little closer to your mouth, Mr. Drake? Thanks. Thank you. Let me turn first, if I may, to the jurisdictional aspects. The Supreme Court is one of those cases that they're one of those courts that would have to be overruled by this three-judge panel if you were to adopt what the defendant suggests in this particular case. The statutes have come into play. That's no problem. We do that all the time. I understand. The Federal Death Penalty Act specifically carves out an area in which tribal authorities retain jurisdiction or the ability to opt in to certain crimes. It's limited to specifically those that are based upon Indian country jurisdiction. That's going to be 1153 and essentially 1152, although 1152 generally does not apply to them. But with respect to those two factors, we then move on to the next aspect, which is that the statute in question here, carjacking resulting in death, is a statute of nationwide application. The courts that have addressed that in virtually every circuit have found it to have an appropriate interstate nexus commerce cause connection to the intent of the statute. The one of the things that comes out of Wheeler is that Federal jurisdiction extends to crime over which there is Federal jurisdiction, regardless whether an Indian is involved. So in this particular situation, it matters not whether this offense occurred in Sawmill or Salie or Sedona or San Francisco. If there were carjacking resulting in death, it would be a situation where Federal law would apply. It would apply regardless whether the State of California did not like the death penalty and did not have a death penalty. It would apply in a Federal context. And so it would apply in an Indian reservation. The statute that the statute that defense counsel talks about, which involves the Durrell fix, occurred in 1991. In 1994, the statute that we're talking about today, the Federal Death Penalty Act, was enacted. And I have cited in the government's brief in this portion statutory history that comes regarding the introduction of that particular statute. Most pointedly, we have cited the testimony submitted by the Navajo Nation regarding their desire that tribes be exempted from application of the Federal death penalty. It was a request for sovereigns. It was a request to determine what applied. The response of Congress was not to grant that request. They did not permit the tribe to opt in on anything. They permitted the tribe to opt in only on those cases that were derived basically on or, excuse me, solely on Indian country jurisdiction, where an Indian was involved and it occurred on an Indian reservation. That is a limited carving out. It does not, as counsel suggests, suggest somehow that the Court or the Congress intended that it also apply to every other type of statute. In other words, if we were to accept the defense position, it would be that if this defendant committed this offense in Sedona on private property where he would be subject to Federal jurisdiction, would the tribe then have the right to opt in or opt out and say the Federal government couldn't prosecute him? If, on the other hand, he had committed the offense in Sedona and he would be subject to Federal jurisdiction and the death penalty, then let's move the citus to the Navajo reservation. Would the Federal law not apply in the Navajo reservation? That's general applicability, Federal law? That's what they're asking the Court to carve out, and we believe that's not warranted under the statutes. The issue regarding tribal sovereignty is, as the Navajo Nation noted when they were Wheeler says that the Federal courts, the Federal government controls Indian policy. And if it decides to make Indian policy that, as it did with the Major Crimes Act, 13, 7, whatever the number of crimes is, subject to Federal jurisdiction, it can do so. And that's what it did with respect to the Federal Death Penalty Act. It said specifically that these crimes are death eligible if they occur. Now, the defendant has talked about the religious freedom and whether that's violated. I won't spend a lot of time on that. I think if you look at the American Indian or Native American Religious Freedom Act and the Restoration of Religious Freedom Act, neither of those will come into play. There are cases that deal with those. Let's talk for just a second about the jury instruction that were given the court. The defendant talked about some of the issues having to do with whether the jury instructions improperly set the standard or set the bar. The jury instructions in this case followed the statute. They provided that the Death Penalty Act gateway factors and intent had to be included and found by the jury beyond a reasonable doubt. They also required that for any aggravating factor, the jury had to find that beyond a reasonable doubt. So as to those matters, the jury instructions were clear and upheld beyond a reasonable doubt standard. They did do what the statute permits, which is let the jury engage in a weighing when it got to whether the aggravating factors were substantially outweighed by the mitigating factors. They didn't require that that be decided beyond a reasonable doubt. Pardon me? They did not require that that issue be decided beyond a reasonable doubt. They did not, no. And the statute does not require it either. And so in that situation, we suggest that this was a sentencing determination, if you will. The defendant was made eligible for the death penalty based upon the age, the gateway intent factors, and the aggravating factor, each of which was found by a jury beyond a reasonable doubt, each of which was included in the indictment that was presented in this case, and so we believe that was sufficient. We then get into the next issue of whether the death penalty ought to be imposed or whether the mitigating factors outweighed it, and that, the statute says, is committed to the, not discretion, but committed to the jury in, to engage in a weighing of those issues. By what, to what, to what extent? Substantial. Substantially outweighed, I believe, is what the statute requires. Means what, really? I mean, I don't understand what that means. Is that, like, clear and convincing or? The instruction, I thought there was an instruction that explained that, and if I can find that, I will, and bring that to the Court's attention. But my recollection was that the test was whether it was substantially. I don't think either of the lawyers argued about the typical proof beyond a reasonable doubt and clear and convincing and things of that sort. It was just a substantial outweigh. It was a matter that the jury didn't have to get confused in terms of technical legal standards. It could focus its attention on terms that the jury understood. Well, what's so confusing about beyond a reasonable doubt? They were asked to apply it at every other step in this process, and then you suddenly think it would confuse them to apply it here? No. I don't suggest it would confuse them to apply it here. I suggest the statute doesn't require it, and that the cases don't require it either. In this particular situation, the Court has outlined what must be done, and the jury was not confused by these issues regarding which particular standard it might be. Yes, they understood and had applied beyond a reasonable doubt, but the jury also found certain mitigating factors. They were able to engage in that way, in that consideration. And so I suggest to you that that shows the jury was capable of doing the correct analysis in the matter. Let me turn, if I may, then, to some issues that came up with respect to the comments of prosecution and the matters of that sort, and also the issues regarding some alleged discovery issues. The first thing to note is that only one of those really rose to the level of an objection or a request for a mistrial. That had to do with the statements made in opening statement by the government counsel to the effect that Mr. Orsinger would say. And as to that, the judge, at the time the objection was made, the motion for mistrial was made after the closing or after the conclusion of the opening statement. The judge didn't think there was a problem and basically almost dismissed the matter out of hand, because it had not struck her at that time, apparently, as sufficient. Upon going back and reading the transcript, it perhaps looked a little colder and a little more stark than it was, but one has to put that in the context of the overall proceeding here. As the prosecution explained, it offered that statement to show the effect it had upon Mr. Mitchell, the defendant, and his defense brought out in its cross-examination of Agent Kirk and others. The defendant was moving into a more gradual admission of this offense, and he started to say he was harmless. I'm saying it was harmless, and I'm saying that when you get to it, the judge basically after the discussion on the motion for mistrial worked with the parties to arrive upon an agreed-upon statement that would be acceptable. And so I think if you want to view it as a unit of evidence, you have to look at the  Roberts. And what did she say? She told the jury what the counsel says is not evidence, is that it? Yes. And she told them that before they said it, before. She didn't tell them to disregard it. She just said what counsel says is not evidence. She didn't strike at her. That's correct. That's correct. And then if you want to engage in a discussion of whether it's harmless, take a look at where it goes in the rest of the case. The government was permitted by the Court, and the defendant did the same thing, to explain that before they talked to Mitchell and he admitted that he cut the girl's throat twice, they told him he talked to Orsinger. The defendant, in his own words, in three separate statements to different FBI agents, told them that he'd cut the girl's throat, that he had stabbed Alice Slim, and that he had thrown rocks upon the girl and told her to lay down and die, and then that he had dug the hole so that the heads severed and the hands severed could be buried in that hole and put away. If you look at the words out of the defendant's own mouth, that's pretty damning compared to one statement that's made in opening statement. And those kinds of overstatements, if you will, or statements of what you think the evidence will be, happen frequently throughout the United States on a regular basis. So I suggest to you that that was not overwhelming evidence of prejudice and matters of that sort. What about the statement during the penalty phase about how the Attorney General decides that this guy deserves the death penalty but not somebody else? I find that troubling. Yeah. And again, when you try to determine whether a statement has prejudicial effect in the proceeding, you have to consider, first of all, the entire evidence in the case, and you have to consider the role of defense counsel. Defense counsel brought in the letter from the Attorney General, or from the U.S. Attorney, first of all, with respect to Mr. Nakai, informing Nakai that he would not be subject to death penalty. The defense brought in through the examination of, I believe, Agent Duncan, the facts of the Nakai case and argued those at some length in his jury summation. And then you end up in a situation where he has suggested that there must be some reason. We don't know. Defense counsel said, basically, there must be some reason why there was a difference in this case. We don't know what it was. Maybe it was the victims. And in that sort of a situation, the government response, I think, is a fair response. It shows the defendant had talked about the protocol situation and how this thing was run up the chain to the Attorney General's office. So when the government comes in and says a decision was made, a rational decision was made, I think that's a fair response. It is not suggesting that, look, I've got this body of evidence over here. It simply responds to the comment that was made by the defense. There's one other comment I want to pick up, because you may run across it inadvertently in the brief, and it's in reference to something about stringing him up, that if this were tombstone, we might have strung him up. And I don't want you to be troubled by that one for the following reason. Defense counsel, when they were speaking, talked about the defendant, his race, his religion. They brought it up in their – by the way, they brought it up in the opening of their penalty fate. They brought up specifically at that point, and I'll reference you to pages 3750, and to 3751, where they reference the defendant's race. They talk about the Navajo people. You're going to hear from people who have known Lesmond and the Navajo people for years about whether this is the right thing to do in this case. And then they go on in 3751 and talk about how the Navajo Nation didn't want to – the U.S. Attorney to seek death penalty, and they'll explain why the Navajo Nation doesn't want to do that. So, on the one hand – What does that have to do with the comment about stringing him up in tombstone, you said? I'm on my way there. I'm sorry. Let me get to work. I was waiting. Okay. The defense, in its point, talked about what the jury had to decide and whether this was an issue regarding vengeance or not. And it said, if vengeance and revenge were what we were after, we would just turn people like Lesmond Mitchell over to the families of the victims and see what happens. And in response, the government said something to the effect that if this were tombstone years ago, they might have taken him out and strung him up. But that's not the way it works. That's what the government said. And so I suggest to you that's why – Well, I didn't say that. It doesn't work for the victims. It works for the defendant, is what he said. Yes. He went on to say that as well. I agree. That was the next sentence. I think it was right after stringing him up. I think. Or maybe it wasn't. Yeah. It was the same page. All right. If the Court has other questions for me, I'd be happy to address them. Otherwise, I want to make sure Mr. Kirby has enough time to speak with you. Thank you.  I'm Vincent Kirby with the United States Attorney's Office in Phoenix. Addressing the questions of race in this trial and sentencing, race is a part of this case. It's an Indian country case. It's unavoidable. But it's a far cry to say that questions touching on race were asked and to categorize them as racial discrimination or racial discriminatory intent. If you look at the questions posed by Judge Murgia, most of the time it was the venire person who interjected, I'm Native American, I am Navajo, it is based on my beliefs. From that portion, questions were asked, questions that needed to be asked and proved by the fact that three experienced defense lawyers sat through four weeks of jury selection and not once ever said, Judge, I don't think this is appropriate. It was appropriate to judge new sensitivities of Native Americans to the death penalty and it was appropriate to seek out biases where appropriate. Mr. Roanhorse, No. 24, the one question that really stuck was that he said it was wrong, in response to a defense question, it was wrong for the defendant. But does it matter if it's wrong? He didn't think the death penalty was right. He didn't. But he said he could apply it. Why is that a basis for the challenge? The basis for the challenge is that he was inconsistent. He said that he thought he could impose a death penalty, but how can one impose a death penalty if he says it is wrong to put a Navajo to death? Well, because you follow the law. That's the theory. Well, that's not. You do think juries don't have to agree with the law. He was he was equivocal in other areas. He said it would affect him spiritually. He didn't know if he could sit in judgment of a fellow Navajo. He didn't know if he could look at pictures because of the taboo against dead bodies, dead people in the religion or in the culture. Those were responses that he gave. He gave a myriad number of answers. That concerned the Court. I can understand why a prosecutor might decide to exercise a peremptory challenge, but I don't see why he should be recused if he says these are all very difficult things. You know, it should be difficult to impose a death penalty. But I can do it even though, you know, I don't agree with the law and even though it's difficult. Is that a basis for a recusal? I believe it's a basis for recusal when he says it's wrong for the government to put someone to death. I don't see how you get around and say I can set that aside. And that was one of the last things he said, despite all of the questions and answers that the Court has brought up. One of the last things he said to the defense attorney is it's wrong. And I don't know how a judge can look at someone and say you've just said it's wrong for the government to do this. How can you set that aside? Kennedy, anyone who doesn't believe in the death penalty, even though he will apply it, is automatically off the jury, and the only people are people who believe in it, who believe the death penalty is a good thing. No. In this particular veneer person's responses, among the fact that he said it was wrong is that he had trouble with it spiritually, that this was not something that took Well, I would think a lot of people would. I think if you followed a number of religions, you would have trouble with it spiritually. But your duty as a citizen is to ignore your individual views or your religious views if you can do it. If you can't do it, you're not allowed to sit on the jury. If you can, you are. Well, I will simply submit that I think the judge, in a well-reasoned, thoughtful process, determined that his answers to the questions, including those discussed, just rendered him unable to put those aside and fairly carry out his duties. As far as number 39, there was equivocation on 39's questions and answers all over the place. She doesn't know. I think I can. I'd like to think that. But I ask you to look at a questionnaire. Every answer that she said, which was in opposition to the death penalty, said, see my answer to question number 60. Question number 60 was, I believe it reduces society to the level of the evildoer. Her thoughtful responses to the questionnaire, a lot of people just checked boxes. She didn't just check boxes. She wrote things. She kept referring back to, see my statement in question 60, giving the judge every opportunity to try and find out where this person was coming from. She set the bar very high. She says that I think it's appropriate for a Charles Manson and a Ted Bundy. But by and large, she valued life, couldn't take it, believed it was wrong for society. I think in the Vennire questioning, she tried what she thought was either pleasing the court, pleasing the parties, but she just didn't know. And she said, I can't tell you until I get there. She equivocated to such an extent that the judge had no choice but to combine the questions, answers to the questionnaire and the answers that she received in court, as well as watching this juror, this Vennire person, trying to struggle with the most difficult of questions. As to the rest of the questioning, five to seven jurors, Native American jurors, were excused for cause based on a death penalty. The remainder of them were excused. One had a felony conviction, several had medical problems, any number of them had financial hardships. By and large, all of those Native Americans were excused without objection. So this was not a discriminatory process because of their religious views, their race. It was some had trouble, some did not. At least three members of the Native American community made it to the final day of jury selection. Two of those were struck for financial hardships and the medical hardship that arose after they had been questioned in the preceding four weeks. So I think it's very unfair to categorize the judge's role in this offense as asking racial discriminatory questions. I think that the composition of this jury was a product of the process that the court has engaged in according to its plan. There's nothing in the record to indicate that anything was done to intentionally seek out and exclude Native Americans. As the Court is aware, 3,000 initial questionnaires were sent out, an awful lot were not returned, an awful lot sought excuses. We have no evidence to suggest that anyone acted in a manner designed to unfairly discriminate against anyone. There are certain excuses that are set up that are mandated, and if the person claims those, they're excluded. But none of them were excluded because of their views of the death penalty until they got to the courthouse. So unless there are any other questions about the rest of the trial, we would submit those, are briefed to the court, and ask that the defendant's conviction in his sentence be affirmed. Thank you. Good morning. With the Court's indulgence, I'd like to return to the jury, the exclusion of Native American jurors, and then touch again briefly on jurisdiction. If the prohibition against racial discrimination in the application of the death penalty is to mean anything, this case has to be reversed. If we look at the statistics over the life of this case, we have over 98 percent of all Native Americans, 434 Native Americans who initially respond for jury service in this case, are excluded as either unqualified or for cause. And if we look, Your Honor, at the questions, I would just – would like to return to Judge Reimer's question about whether or not Mr. Roanhorse, No. 24, said that he could not sit in judgment of a fellow Navajo or a fellow Native American. He does not, in fact, ever say that. He says it would be difficult. And if we look at Adams v. Texas, and look at what the Court says in Adams when it's limiting Witherspoon, it says, absolutely, it is not grounds for excusing somebody for cause if it would be difficult, if it would, in fact, be something that would trouble them greatly. This is not grounds for exclusion. And this Court found that to be. And again, look at Mr. Roanhorse's responses. Seven times he unequivocally states that he, in fact, could follow the law, that although he would find it difficult, that he would be able to follow the law and impose it. He says, in fact, goes on to say he would be able to impose a death sentence. If you compare his responses to the responses of jurors who, in fact, favor the death penalty, jurors No. 31, 33, 35, 37, 38, and 36, we have jurors who are clearly expressing difficulty with being able to impose a life sentence in this case. And the Court does not do, in fact, treat them the same way that Mr. Roanhorse is treated. And to go also back to Judge Reimer's questions earlier about whether or not Mr. Roanhorse first indicated that he would have difficulty, and then Judge McGeer merely followed up on his responses. In fact, if you go through the voir dire, he, in fact, states emphatically that he could impose either sentence. And only then is his, is the fact that he is Native American explicitly identified by the Court, and is he explicitly asked whether or not his, the fact that he shares racial characteristics with the defendant, whether that would prevent him from being fair and impartial in this case. No other juror, no Hispanic, no white, no black juror was asked, how is your racial characteristics going to affect your ability to fair, be fair in this case? In fact, those other jurors are asked, have you ever had an experience with a Native American that would prevent you from being fair? There is an assumption in that question that if they are going to be biased as a white, black, or Hispanic juror, it is going to be because of a history of interaction with Native Americans. The questions posed to Native American jurors presume something quite to the contrary. They presume the fact that the defendant is fair. Sotomayor, I don't see how you can now say, well, just because it was asked here, it somehow is racially motivated, and nobody thought so at the time. Your Honor, two points on that. Number one, it is not a question that is asked throughout cases that, that's not a question that's asked throughout cases. I would say, excuse me, you are black, and the defendant is black. How is your shared racial characteristic going to affect your ability to be fair and impartial? What is permissible is to say the defendant is African American or the defendant is black, how is that? Will anything about the defendant's race influence your ability? That was not the questions that were posed. Native American jurors were singled out in a different way. Roberts. Were those questions objected to? No, and that was the second point. In Brown v. Lambert, this Court says it is absolutely irrelevant whether or not they are objected to for an equal protection violation or for an improper excusal for cause under Whitten-Witherspoon. In fact, in Brown v. Lambert, this Court says the defense attorneys may very well have wanted these jurors off, and that's not enough. That doesn't matter. If we look at the history of racial discrimination, particularly in the death penalty context, where we had collusion among them. You know, suit has been granted in that case, Joe. Excuse me, Your Honor? You know, suit has been granted in that case. Yes, Your Honor. But, Your Honor, the principles there stretch through Batson all the way back to Strouder v. West Virginia, where we're talking about where you see collusion on the part of various actors in the scheme. Frequently, particularly in the South and other regions, defense lawyers were quite happy to exclude African-Americans, but it's still unconstitutional to do it, to base it based upon race. I see that my time is running out here. I would ask the Court to please reverse and remand based upon what we have said here and what we have said in our briefs. If the Court would like, I certainly can address more, but it says that my time is running out. Why does it say your time is running out? It says 8 minutes and 45 seconds. It says sum up here, Your Honor. I didn't think you could sum up in 8 minutes and 35 seconds. Okay. I just see that the yellow light came on. I'm happy to ask, Your Honor, as far as for the jurisdiction claim as well, I would first direct the Court again to the Lara case, the 2005 case of the United States Supreme Court. The Court not only references the legislative history in that particular statute, but it quotes portions of it and does as authoritative. And I would point the Court to the House conference report in which the Court, I mean, the House says that first, as Justice Kennedy stated in the Durer decision, Congress determines Indian policy. Second, Indian tribes retain all rights and powers not expressly divested by Congress. All rights and powers not expressly divested. These principles go back to the decisions of Chief Justice John Marshall and are part of the foundation of the Federal-Tribal relation. This is a very explicit and clear statement by Congress that this is, in fact, a sovereignty issue, that tribes retain these rights unless it is explicitly divested. How does that work on laws of general applicability? Do tribes reserve the right to decide whether laws of general applicability  Absolutely, Your Honor. That is, in fact, what Congress, and if you look at the authority that we have provided to this Court, Congress goes through it and says this has always been the understanding, stating back to John Marshall and beforehand, that tribes have this, in fact, inherent sovereignty, that it can only be limited by explicit statements by Congress. When we have the Federal Death Penalty Act enacted, Congress is explicit as far as major crimes. For the Major Crimes Act, the tribes will have the ability to opt into the death penalty. Those are the only crimes that Congress has stated that the death penalty will extend to at all. The Congress is silent as to the others, and silence, it is very clear, is not enough. And the Supreme Court has stated so repeatedly. Again, in Lara, they cite this legislative history as authoritative, which requires an extended death penalty. So I do think that this Court can come back to this question. It is not a question of overruling precedent, because we now have a Supreme Court statement that calls those into question. And this Court clearly has also never ruled on the carjacking statute, and whether or not the carjacking statute, and particularly the death penalty provisions of those, can be extended. And we think that a fair reading, if you go back and look at the precedent from the United States Supreme Court, that it is clear that Congress must act. And when Congress, in fact, has the opportunity to act … Kennedy, are you saying the carjacking statute doesn't apply at all in Indian territory, even aside from the death penalty? Yes, Your Honor. We, in fact, are asserting that. Now, we say that you don't have to go that far in order to grant relief to Mr. Mitchell. This Court can … Well, I don't know how you would distinguish the arguments. I mean, if your argument is that a statute of general applicability doesn't apply at all, it doesn't apply on the reservation unless there's an express statement that would apply to the entire statute. The way we can distinguish it, Your Honor, is if you look at the Eighth Circuit's decisions and the U.S. Supreme Court's decision where they talk about specific Indian rights or policies may, in fact, defeat even a general jurisdiction crime that extends to Indian country. And if a particular Indian right or policy certainly is the tribe's opposition to the death penalty, that is recognized by the United States Congress by permitting the tribes to opt into a death penalty. That is something that is different than any other jurisdictional type of argument. Nowhere else do we see Congress saying, States, you may, in fact, opt in. Territories, you may, in fact, opt in. What they say is tribes, you may do it, because the history of tribal government and tribal sovereignty is so different constitutionally from the history of the State-Federal relation. And so the Court could say, okay, as the Eighth Circuit suggested, that a crime of general jurisdiction may extend to Indian country, but because there is a particular right or policy of the Indian tribe concerning the death penalty and the application of the death penalty for Indian-on-Indian crime, we will, in fact, not permit this extension of death penalty jurisdiction to the tribe, that it will, in fact, defeat that jurisdictional claim, as the Eighth Circuit suggested. Again, Your Honor, one other point. The government has asserted here very candidly that race was a factor in this case. Well, the problem, one of the main problems with that is the Federal death penalty explicitly in the statutory language forbids race from playing a role in the application of that punishment. That's one of the major problems here. We combined Major Crimes Act offenses off the reservation, which with this, and let's be clear, this is the first time that any, first time the Federal government has ever asserted that they have a right to extend Federal death penalty jurisdiction to Indian lands under, through a crime of general jurisdiction. This has not happened before. And so what we have here is a case that combines an absolute prohibition of using race in deciding the punishment under the Federal death penalty act. Do you think Judge Bergia was wrong in asking whether there are people who harbor bias or prejudice against or in favor of Native Americans? No, absolutely not. Isn't that what she, isn't that what she did? That is what she did to white, Hispanic, and black jurors. What she did with Native American jurors was say, you Native American juror, how does your shared racial characteristics with this Native American juror influence whether you can be fair or impartial? That's improper. Batson has said it. Other cases have said that the consideration of race, the assumption that you're, as a juror, that your racial characteristics somehow impact your ability to be fair and impartial. It's an improper consideration. And for a court to use that consideration during a process of excluding 29 of 30 Native Americans from jury service raises the inference of discrimination. And this Court, I mean, the United States Supreme Court in Alexander v. Louisiana said, look at the process that occurs. And in that case, what we had is statistics that are far less severe than what we have here, where we saw initially 21 percent of the jury or the panel for grand jury service was African American. There was exclusion down to slightly over 13 percent by the jury service. It was reduced down to 5 percent before the actual panel was in panel. That, in our case, what we have here is a consistent reduction from 18.6 percent in the initial responses, down to 14 percent of the jurors who actually show up, down to slightly over 1 percent on the veneer before a single panel jury or panel jury service. And that's where the first peremptory strike is exercised. And it should be noted that the first peremptory strike attempted by the government in this case was the last remaining Native American juror. And immediately following that, the next strike is against the only African American juror on the panel. There is clear evidence of racial bias affecting this process. When we're not saying that Judge Alexander and the other case – I see my time is up. You can finish. What the cases say is that you can draw an inference of discrimination and it does not have to do anything to do with racial animus, but it's discriminatory treatment, and that was present. And we would ask the Court, based upon our briefs and our argument here today, to reverse this case. Thank you. Thank you. Thank you both very much. Thank you all. The case is adjourned. It will be submitted.
judges: Reinhardt, Rymer, Silverman